**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **GLOBETECTRUST LLC** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 12-1250-RGA** |
| (1)   **AT&T INC.;** | **JURY TRIAL DEMANDED** |
| (2)   **AT&T OPERATIONS, INC.;** | |
| (3)   **AT&T SERVICES, INC.;** | |
| (4)   **AT&T VIDEO SERVICES, INC.;** | |
| (5)   **VERIZON SERVICES CORP.;** | |
| (6)   **VERIZON CORPORATE** | |
|       **RESOURCES GROUP, LLC; AND** | |
| (7)   **3M COMPANY** | |
| **Defendants.** | |

## THIRD AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff GlobeTecTrust LLC, files this complaint for patent infringement against Defendants AT&T Inc., AT&T Operations, Inc., AT&T Services, Inc., AT&T Video Services, Inc., (together, "AT&T"), Verizon Services Corp., Verizon Corporate Resources Group, LLC (together, "Verizon"), and 3M Company ("3M") (collectively, "Defendants"):

## THE PARTIES

1.     Plaintiff GlobeTecTrust LLC ("GlobeTecTrust") is a Delaware limited liability company with its principal place of business located at GlobeTecTrust LLC, c/o Wilmington Trust SP Services, Inc., 1105 North Market Street, Suite 1300, Wilmington, DE 19801.

2.     On information and belief, Defendant AT&T Inc. is a Delaware corporation with its principal place of business located at 208 S. Akard Street, Dallas, Texas 75202.

3.      On information and belief, Defendant AT&T Operations, Inc. ("AT&T Operations") is a Delaware corporation with a principal place of business at 530 McCullough Avenue, San Antonio, Texas 78205.   AT&T Operations was formerly known as SBC Operations, Inc., and is a wholly owned subsidiary of AT&T Inc.

4.      On information and belief, Defendant AT&T Services, Inc. ("AT&T Services") is a Delaware corporation with a principal place of business at 175 E. Houston, San Antonio, Texas 78205.   AT&T Services was formerly known as SBC Services, Inc., and is a wholly owned subsidiary of AT&T Inc.

5.      On information and belief, Defendant AT&T Video Services, Inc. ("AT&T Video") is a Delaware corporation with a principal place of business at 1010 N. Saint Mary's Street, San Antonio, Texas 78215.   AT&T Video Services does business under at least the following names: AT&T Home Entertainment and SBC Home Entertainment.   AT&T Video Services is a wholly owned subsidiary of AT&T Inc.

6.      On information and belief, Defendant Verizon Services Corp. is a Delaware corporation with a principal place of business at 1320 North Court House Road, Arlington, Virginia 22201.  Defendant Verizon Services Corp. has involvement with or responsibilities for Verizon's FiOS fiber optic systems within the overall Verizon corporate structure.

7.      On information and belief, Defendant Verizon Corporate Resources Group, LLC is a Delaware limited liability company with a principal place of business at One Verizon Way, Basking Ridge, New Jersey 07920.  Defendant Verizon Corporate Resources Group LLC is affiliated with Verizon Services Corp. and has involvement with or responsibilities for Verizon's FiOS fiber optic systems within the overall Verizon corporate structure.

8.      On information and belief, Defendant 3M is a Delaware corporation with its principal place of business located at 3M Center, St. Paul, Minnesota 55144.

## JURISDICTION

9.      This action arises under the patent laws of the United States, Title 35 of the United States Code.  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

10.      On information and belief, Defendants are subject to this Court's jurisdiction because Defendants have, upon information and belief, transacted business in the District and in the State of Delaware.  Specifically, Defendants either directly and/or through intermediaries, upon information and belief, ship, distribute, offer for sale, and/or sell (including via the provision of such services over the Internet) products and services in this District.  Additionally, Defendants AT&T, Verizon and 3M are corporations organized and existing under the laws of the State of Delaware.  Defendants thus have, upon information and belief, minimum contacts with this District and State, has purposefully availed itself of the privileges of conducting business in this District and State, regularly conducts and solicits business within the State of Delaware, and has committed acts of patent infringement in this District and State.

11.      Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c), and 1400(b).

## COUNT I

### (Infringement of U.S. Patent No. 5,457,763)

12.      GlobeTecTrust incorporates and realleges the allegations of paragraphs 1-11 as if fully set forth herein.

13.      On October 10, 1995, the USPTO duly and legally issued U.S. Patent No. 5,457,763 (the "'763 patent"), entitled "Optical Fiber Splice Organizer," to John Kerry, Peter L.

J. Frost, and Robert A. Freeman, who assigned their rights and interests in the '763 patent to British Telecommunications Public Limited Company.  A true and correct copy of the '763 patent is attached as Exhibit A.

14.     GlobeTecTrust is the exclusive licensee of the '763 patent and has the legal right to enforce rights under the '763 patent, sue for infringement, and seek all available relief and damages.

15.     Upon information and belief, 3M infringed (literally and/or under the doctrine of equivalents) the '763 patent in this District and throughout the United States by, among other things, making, using, importing, offering for sale and/or selling an optical cable apparatus claimed in the '763 patent, including, without limitation, 3M 2522 and 2523 Fiber Optic Splice Trays, 3M 2178 Fiber Optic Splice Enclosure, 3M 2178-LS Large Fiber Optic Splice Case, 3M 2178-S Small Fiber Optic Splice Case, 3M 2178-LL Extra Large Fiber Optic Splice Case, and/or any closures using these trays and cases, e.g., 3M FD06-D Fibrdome Closures, 3M FD08-G Fibrdome Closures, 3M FD06-G Closures.

16.     Upon information and belief, AT&T infringed (literally and/or under the doctrine of equivalents) the '763 patent in this District and throughout the United States by, among other things, making, using, importing, offering for sale and/or selling an optical cable apparatus claimed in the '763 patent, including using the same products manufactured by 3M in AT&T's U-verse network.

17.     Upon information and belief, Verizon infriged (literally and/or under the doctrine of equivalents) the '763 patent in this District and throughout the United States by, among other things, making, using, importing, offering for sale and/or selling an optical cable apparatus

4

claimed in the '763 patent, including using the same products manufactured by 3M in Verizon's FiOS fiber optic systems.

18.     Defendants committed these acts of infringement without license or authorization.

19.     As a result of Defendants' infringement of the '763 patent, GlobeTecTrust has suffered monetary damages in an amount not yet determined.

## COUNT II

### (Infringement of U.S. Patent No. 5,588,076)

20.     GlobeTecTrust incorporates and realleges the allegations of paragraphs 1-11 as if fully set forth herein.

21.     On December 24, 1996, the USPTO duly and legally issued U.S. Patent No. 5,588,076 (the "'076 patent"), entitled "Optical Fibre Management System," to John Peacock, Peter L. J. Frost, and John Kerry, who assigned their rights and interests in the '076 patent to British Telecommunications Public Limited Company.  A true and correct copy of the '076 patent is attached as Exhibit B.

22.     GlobeTecTrust is the exclusive licensee of the '076 patent and has the legal right to enforce rights under the '076 patent, sue for infringement, and seek all available relief and damages.

23.     Upon information and belief, 3M is infringing (literally and/or under the doctrine of equivalents) the '076 patent in this District and throughout the United States by, among other things, making, using, importing, offering for sale and/or selling an optical cable apparatus claimed in the '076 patent, including, without limitation, 3M FD06-D Fibrdome Closures, 3M FD08-G Fibrdome Closures, and/or 3M FD06-G Closures using, e.g., 3M 2522 and 2523 Fiber Optic Splice Trays, 3M 2178 Fiber Optic Splice Enclosure, 3M 2178-LS Large Fiber Optic

Splice Case, 3M 2178-S Small Fiber Optic Splice Case, and/or 3M 2178-LL Extra Large Fiber Optic Splice Case.

24.     Upon information and belief, AT&T is infringing (literally and/or under the doctrine of equivalents) the '076 patent in this District and throughout the United States by, among other things, making, using, importing, offering for sale and/or selling an optical cable apparatus claimed in the '076 patent, including using the same products manufactured by 3M in AT&T's U-verse network.

25.     Upon information and belief, Verizon is infringing (literally and/or under the doctrine of equivalents) the '076 patent in this District and throughout the United States by, among other things, making, using, importing, offering for sale and/or selling an optical cable apparatus claimed in the '076 patent, including using the same products manufactured by 3M in Verizon's FiOS fiber optic systems.

26.     Defendants committed these acts of infringement without license or authorization.

27.     As a result of Defendants' infringement of the '076 patent, GlobeTecTrust has suffered monetary damages in an amount not yet determined, and will continue to suffer damages in the future unless Defendants' infringing activities are enjoined by this Court.

28.     GlobeTecTrust has also suffered and will continue to suffer severe and irreparable harm unless this Court issues a permanent injunction prohibiting Defendants, their agents, servants, employees, representatives, and all others acting in active concert therewith from infringing the '076 patent.

## DEMAND FOR JURY TRIAL

Plaintiff GlobeTecTrust, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues so triable by right.

## PRAYER FOR RELIEF

For the above reasons, GlobeTecTrust respectfully requests that this Court grant the following relief in favor of GlobeTecTrust and against Defendants:

(a)     A judgment in favor of GlobeTecTrust that Defendants have directly infringed (either literally or under the doctrine of equivalents) one or more claims of the '763 and '076 patents ("the Asserted Patents");

(b)     A permanent injunction enjoining Defendants and their officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert or participation with Defendants, from infringing the '076 Patent;

(c)     A judgment and order requiring Defendants to pay GlobeTecTrust its damages, costs, expenses, and pre-judgment and post-judgment interest for Defendants' infringement of the Asserted Patents;

(d)     A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding GlobeTecTrust its reasonable attorneys' fees; and

(e)     Any and all such other relief as the Court deems just and proper.

May 16, 2013

OF COUNSEL:
Marc Fenster
Alexander C.D. Giza
RUSS AUGUST & KABAT
12424 Wilshire Blvd., Suite 1200
Los Angeles, CA 90025
mfenster@raklaw.com
agiza@raklaw.com
(310) 826-7474

_/s/ Kenneth L. Dorsney_
Kenneth L. Dorsney (#3726)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
(302) 888-6800
kdorsney@morrisjames.com

*Attorneys for Plaintiff GlobeTecTrust LLC*

# EXHIBIT A



US005457763A

# United States Patent [19]

**Kerry et al.**

[11] **Patent Number:** 5,457,763

[45] **Date of Patent:** Oct. 10, 1995

[54] **OPTICAL FIBER SPLICE ORGANIZER**

[75] Inventors: **John Kerry; Peter L. J. Frost**, both of Ipswich; **Robert A. Freeman**, Rushmere Park, all of England

[73] Assignee: **British Telecommunications public limited company**, London, England

[21] Appl. No.: **820,629**

[22] PCT Filed: **Jun. 1, 1990**

[86] PCT No.: **PCT/GB90/00857**

§ 371 Date: **Jan. 24, 1992**

§ 102(e) Date: **Jan. 24, 1992**

[87] PCT Pub. No.: **WO90/15351**

PCT Pub. Date: **Dec. 13, 1990**

[30] **Foreign Application Priority Data**

Jun. 2, 1989 [GB]    United Kingdom ................... 8912767

[51] Int. Cl.$^6$ ................................................. **G02B 6/36**

[52] U.S. Cl. ................................. **385/135**; 385/134

[58] Field of Search ...................... 385/134, 135, 385/147

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,840,449 | 6/1989 | Ghandeharizadeh | 385/135 |
| 5,066,149 | 11/1991 | Wheeler et al. | 385/135 |
| 5,067,784 | 11/1991 | Debortoli et al. | 385/135 |
| 5,249,252 | 9/1993 | Noto | 385/135 |
| 5,319,732 | 6/1994 | Jones | 385/135 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0178179 | 4/1986 | European Pat. Off. | 385/135 X |
| 0215668 | 3/1987 | European Pat. Off. | 385/135 X |
| 2176907 | 1/1987 | United Kingdom | 385/135 X |

*Primary Examiner*—Brian Healy
*Attorney, Agent, or Firm*—Nixon & Vanderhye

[57] **ABSTRACT**

A splice organiser comprises a tray having a plurality of formers (**14, 15**) which control the minimum bend radius of the fibres, a groove for retaining a splice, an enclosure into which coiled fibre loops are introduced and permitted to expand so that they are retained by the resilience of the fibre itself, and a plurality of guide tracks (**23, 24, 25**) which enable fibres to enter and exit the organiser at any corner of the tray.

**12 Claims, 2 Drawing Sheets**



*Fig.1.*

## Fig.2A.



## Fig.2A.



## Fig.3.



5,457,763

1
**OPTICAL FIBER SPLICE ORGANIZER**

## BACKGROUND OF THE INVENTION

This invention relates to optical fibre distribution and in particular but not exclusively to branched networks for optical telecommunications.

Presently optical fibres are utilised in trunk lines for telecommunications but it is desirable to have optical transmission within other points in a network, such as in branches between an exchange and a subscriber. Elements in such branches need to be reliable under the extremes of ambient temperature and to permit broad spectrum transmission over the range of wavelengths utilised, at present usually 1300 to 1550 nm. It is also necessary to ensure that minimum losses occur due to macrobending as optical fibres emerge from branching elements such as couplers.

Our co-pending British application No. 8827348.7 describes an optical fibre distribution arrangement comprising a coupling array and a splice organiser associated with each input and output line of the coupling array, the splice organisers being mounted to a supporting frame and capable of limited relative movement with respect to one another so as to permit access to the splices stored therein. A splice organiser described in the application comprises a tray having a groove for retaining a splice and recesses for confining loops of optical fibre under their own natural resilience. In this splice tray there is only one entry/exit port for the fibre, which port is located at one corner. However, in some instances it would be preferable to be able to have a choice of entry and/or exit port from a number of alternatives. In this case it is desirable that means be provided for the fibre to be routed to the alternative entry/exit ports in such a way that significant optical loss from the fibre due to macrobending is avoided. It is additionally desirable that there are a number of alternative routes to each alternative entry/exit port.

## SUMMARY OF THE INVENTION

The present invention provides a splice organiser comprising a tray having a plurality of formers to define the minimum bend radius of optical fibres so that significant optical loss from the fibres is avoided, a groove for retaining a splice, and at least one recess for confining loops of optical fibre under their own natural resilience, the or each recess being positioned between a respective pair of adjacent formers and being sized and shaped to confine loops of optical fibre having radii of curvature exceeding the minimum bend radius, and in which a plurality of guide tracks are provided to enable fibres to enter or exit the organiser at any one of a plurality of ports.

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention is now described by way of example with reference to the accompanying drawings in which:

FIG. 1 is a side view of a preferred embodiment of a splice organiser according to the invention;

FIG. 2A shows a detail of one feature of the preferred embodiment;

FIG. 2B is a cross-sectional view of the feature shown in FIG. 2A; and

FIG. 3 shows a further feature of the preferred embodiment.

2
## DETAILED DESCRIPTION OF THE INVENTION

FIG. 1 shows a preferred splice organiser which enables a single splice 16 to be stored on one side of an organiser and fibre to enter or exit the organiser at any one of the four entry/exit ports 27 located at the four corners of the tray. The organiser comprises a tray 13 having a central raised, substantially circular former 14, and two raised curved end formers 15, the splice 16 being positioned in a splice retaining groove located, as shown, on a long side of the organiser. The fibres enter and pass out of the organiser along any one of separate channels 17 which lead to each of the four corners of the tray. Spare loops of fibre on each side of the splice are stored in the organiser by forming coils of fibre and placing these over the former 14 after passing the first bend after the splice around the outer side of the curved end former 15. Alternative winding patterns around both the end formers or over one end former and the opposite side of the central former may also be used, but several turns should preferably be placed over the central former, and it is preferable to have a single length of fibre close to the splice passing along a separate channel.

The natural resilience of the fibres will cause the coils placed over the central former to expand outwardly into a configuration of varying diameter turns. This procedure is then repeated for the fibre on the other side of the splice. Care has to be taken not to coil the fibres over-tightly in the first instance. In the situation where only the first bend of the fibre after the splice has been passed around the outer side of the curved former, or another channel is provided, the organiser presents a separate track 18 to facilitate non-destructive testing eg via 'Clip-On' (Trade Mark) access technology, see PCT patent application WO 88/07689, should it be necessary for any reason to gain access to the data transmission along the fibre. A route map may be used to determine on which side of the splice the fibre is to be tested, and a suitable tool may be used for lifting the fibre out of the track. This arrangement ensures that access is gained at a point on the fibre relatively close to the splice, so that if the fibre is in any way damaged by the action of gaining 'Clip-On' access, it is simple to discard the damaged length of fibre, adjust the spare coils, and form a new splice without losing much fibre, thus avoiding the possibly serious mistake of damaging and having to discard a much longer portion of the spare fibre.

Each of the channels 17 is connected to a recessed semicircular track 23 which extends between the two channels 17 at each short end of the organiser. The tracks 23 touch further recessed semicircular tracks 24 at their mutual mid points. Recessed longitudinal tracks 25 extend between the channels 17 disposed along the same long side of the organiser. With this arrangement a fibre in the organiser can be routed to or from any channel 17. For example consider a fibre, wound clockwise as viewed around the central former 14. This fibre may be routed tangentially from the former 14 along the tracks 25 to exit via either the top right or bottom left (as viewed) channel 17. Alternatively the fibre may be guided into one of tracks 24 and then diverted into the intersecting track 23, the fibre undergoing an inflexion, to exit at the bottom right or top left channel 17. Corresponding entry routes apply, and analogous routing for anti-clockwise wound fibre is also possible. The fibres to be spliced are routed through the organiser by laying them in the recessed tracks in a suitable route from the chosen entrance, via the splice 16, to the chosen exit of the organiser; the spare loops of fibre then being coiled up and laid

5,457,763

3

over the central former **14**, thus overlying the fibres in the recessed tracks.

Each of the recessed tracks **23**, **24** and **25**, may have small tabs or clips **21** which retain the fibre in the track. Larger clips **26** may also be provided to retain the spare loops of fibre around the central former **14**.

At each corner of the splice organiser the channels **17** are connected to short lengths of tube **19** which fit through holes **27** in the tray **13**. These tubes are shown in FIG. 2A, which shows a side view of a tube **19**, and in FIG. 2B, which shows a cross-sectional view of the tube. Each tube is formed with a longitudinal slit **20**, and a longitudinal taper of the order of half a degree along at least part of its length, which is provided for ease of removing the tubes from their mould during manufacture. Capillaries for supporting the fibres are then passed through the tube before the tube is pushed into a hole **27** at one corner of the tray. These holes have a slightly smaller diameter than that of the tubes so that the slit **20** is forced to close, and the final circumferences of the tube and the hole match when the tube is pushed in until the tube abuts the end of channel **17**.

The tubes **19** consitutute hinge pins, by which means the splice organisers **2** can be pivotally mounted on a supporting frame (not shown). Furthermore, as shown in FIG. 3, a hinged or clip-on lid **22** may be provided to cover the organiser, the lid pivoting on the tubes **19**, or the organiser may be arranged to co-operatively engage with an adjacent organiser so that the confronting organisers effectively form covers for each other. The reverse side of the organiser preferably has a similar or identical configuration for storing another splice and associated fibre.

A plurality of the preferred splice organisers may be mounted to a supporting frame so as to be capable of limited relative movement with respect to one another and hence permit access to the splices stored therein.

By way of example the dimensions for a preferred embodiment of the splice organiser will now be given. The overall dimensions are approximately 172 mm long by 78 mm wide, referring to FIG. 1, and 8 mm deep, referring to FIG. 3. The central former **14** is about 60 mm in diameter, hence defining a minimum bend radius for primary coated optical fibre which prevents significant optical loss, due to macrobending, from the fibre when it is positioned around the former. The guide tracks **18**, **23**, **24** and **25** are approximately 1 mm wide and vary in depth from about 1 mm to about 2 mm . The curved tracks **18**, **23** and **24** have a radius of curvature of 35 mm again chosen to avoid optical loss from the optical fibres due to macrobending.

The splice retaining groove **16** is about 2.4 mm wide and about 70 mm long to give a snug fit for a conventional heat shrink protected fibre splice.

The tube **19** has an outer diameter of about 1 mm and an inner diameter of about 0.5 mm. The face of the splice tray shown in FIG. 1 is substantially planar to enable adjacent trays to be stacked closely together without wasted space. Typically a tray will have a bow over its whole length of less than about 0.5 mm.

The splice tray **13** is preferably moulded from acrylonitrile butadiene styrene (ABS). The tubes **19** are constructed from polyvinylidene fluoride (PVDF) and the lid **22** is formed from a clear polymer such as an acrylic resin.

We claim:

**1**. A splice organiser comprising:

a tray having a plurality of entrance/exit ports, a plurality of fibre guide means to define the minimum bend radius of optical fibres so that significant optical loss from the

4

fibres is avoided, a groove for retaining a splice, and at least one recess area for confining loops of optical fibre under their own natural resilience,

the or each recess area being positioned between a respective pair of adjacent fibre guide means and being sized to occupy substantially at least as much area as would be encompassed by a complete loop of minimum bend radius optical fibre and shaped to confine loops of optical fibre having radii of curvature exceeding the minimum bend radius, and

a plurality of guide tracks being provided to enable fibres to enter or exit the organiser at any one of said plurality of ports, portions of said guide tracks being constituted by recessed tracks formed in the or each said recess area.

**2**. A splice organiser as claimed in claim **1**, wherein the minimum radius of curvature of the guide tracks is such as to avoid significant optical loss in fibres in the guide tracks.

**3**. A splice organiser comprising:

a tray having a plurality of fibre guide means to define the minimum bend radius of optical fibres so that significant optical loss from the fibres is avoided, a groove for retaining a splice, and at least one recess for confining loops of optical fibre under their own natural resilience,

the or each recess being positioned between a respective pair of adjacent fibre guide means and being sized and shaped to confine loops of optical fibre having radii of curvature exceeding the minimum bend radius, and

in which a plurality of guide tracks are provided to enable fibres to enter or exit the organiser at any one of a plurality of ports,

wherein at least one port is provided at each corner of the tray.

**4**. A splice organiser comprising:

a tray having a plurality of fibre guide means to define the minimum bend radius of optical fibres so that significant optical loss from the fibres is avoided, a groove for retaining a splice, and at least one recess for confining loops of optical fibre under their own natural resilience,

the or each recess being positioned between a respective pair of adjacent fibre guide means and being sized and shaped to confine loops of optical fibre having radii of curvature exceeding the minimum bend radius, and

in which a plurality of guide tracks are provided to enable fibres to enter or exit the organiser at any one of a plurality of ports,

wherein the organiser is provided with a substantially central, circular fibre guide means and a pair of curved end fibre guide means, a respective recess being positioned between the central fibre guide means and each of the end fibre guide means.

**5**. A splice organiser as claimed in claim **4**, wherein the splice-retaining groove is positioned adjacent to the central fibre guide means, and wherein one loop of the fibre on either side of the splice is passed separately round a respective one of the end fibre guide means.

**6**. A splice organiser comprising:

a tray having a plurality of entrance/exit ports, a plurality of fibre guide means to define the minimum bend radius of optical fibres so that significant optical loss from the fibres is avoided, a groove for retaining a splice, and at least one recess area for confining loops of optical fibre under their own natural resilience,

the or each recess area being positioned between a respective pair of adjacent fibre guide means and being sized

5,457,763

5                                              6

to occupy substantially at least as much area as would be encompassed by a complete loop of minimum bend radius optical fibre and shaped to confine loops of optical fibre having radii of curvature exceeding the minimum bend radius,

a plurality of guide tracks being provided to enable fibres to enter or exit the organiser at any one of said plurality of ports, and

wherein tubes fitted at corners of the tray constitute hinge pins by which the splice organiser can be pivotally mounted to a frame, and the tubes accommodate capillary tubes for conducting fibres into the splice organiser.

7. A splice organiser as claimed in claim 6, wherein the tubes form means whereby a hinged or clip-on lid may be fitted to the splice organiser.

8. An optical fibre splice organiser comprising a tray having:

at least three fibre entrance/exit ports;

a groove for retaining a splice between optical fibre ends;

a central relatively raised area having an outer radius of curvature no less than the minimum bend radius of optical fibres so that significant optical loss from fibre bending is avoided when an excess length of said fibre ends is wrapped therearound;

at least one relatively raised end area spaced from said

central area and having an inside radius of curvature no less than said minimum bend radius such that said excess of said fibre ends is located about said central area and within said end area(s) and permitted to expand under its own resilience into loops of a substantial range of different sizes thus accommodating a continuous range of excess fibre lengths; and

recessed guide tracks disposed between said central area and said end area(s) and leading to/from said entrance/exit ports.

9. A splice organiser as in claim 8 wherein said recessed guide tracks also extend to/from said groove for the splice.

10. A splice organiser as in claim 8 wherein two of said raised end areas bracket said raised central area and are each spaced therefrom by an interposed area that is at least as large as said central area.

11. A splice organiser as in claim 10 wherein said tray is of rectangular shape having at least one of said entrance/exit ports at each of its four corners.

12. A splice organiser as in claim 8 wherein said raised end area(s) also has (have) an outer radius of curvature no less than said minimum bend radius and wherein said recessed guide tracks extend around the outer portion of the raised end area(s).

* * * * *

# EXHIBIT B



US005588076A

# United States Patent [19]

## Peacock et al.

[11] **Patent Number:** 5,588,076

[45] **Date of Patent:** Dec. 24, 1996

[54] **OPTICAL FIBRE MANAGEMENT SYSTEM**

[75] Inventors: **John Peacock**, Otley; **Peter L. J. Frost; John Kerry**, both of Ipswich, all of England

[73] Assignee: **British Telecommunications public limited company**, London, England

[21] Appl. No.: **278,217**

[22] Filed: **Jul. 21, 1994**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 202,190, Feb. 24, 1994, Pat. No. 5,548,678.

[30]     **Foreign Application Priority Data**

| | | | | | |
|---|---|---|---|---|---|
| Sep. 10, 1993 | [EP] | European Pat. Off. | | | 93307145 |
| Apr. 28, 1994 | [EP] | European Pat. Off. | | | 94303091 |

[51] Int. Cl.⁶ ...................................................... **G02B 6/35**

[51] Int. Cl.$^6$ ...................................................... **G02B 6/35**

[52] U.S. Cl. ................................... **385/20;** 385/135

[58] Field of Search ...................... 385/134–139, 385/20

[56]           **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,595,255 | 6/1986 | Bhatt et al. | 350/96.2 |
| 5,100,221 | 3/1992 | Carney et al. | 385/135 |
| 5,129,030 | 7/1992 | Petrunia | 385/135 |
| 5,323,480 | 6/1994 | Mullaney | 385/134 X |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO91/05281 | 4/1991 | WIPO . |
| WO91/10927 | 7/1991 | WIPO . |
| WO94/23324 | 10/1994 | WIPO . |

#### OTHER PUBLICATIONS

Patent Abstracts of Japan, vol. 8, No. 219 (P–306) (1656) 5 Oct. 1984 & JP–A–59 102 208 (N.D.D.K.) 13 Jun. 1984.

Hornung et al; "Flexible Architecture and Plant for Optical Access Networks"; International Wire & Cable Symposium Proceedings 1992; pp. 53–58. Nov. 16, 1992.

*Primary Examiner*—John D. Lee
*Assistant Examiner*—Phan T. H. Palmer
*Attorney, Agent, or Firm*—Nixon & Vanderhye P.C.

[57]           **ABSTRACT**

An optical fibre management system manages a plurality of optical fibres such that the fibre(s) of each single circuit is/are routed separately from the fibres of other circuits. By providing such single circuit management, optical signals carried by any given single circuit are not degraded by handling operations carried out on the fibres of other circuits.

**8 Claims, 9 Drawing Sheets**





*Fig.1*

*Fig.2*

This PDF of U.S. Utility Patent 5588076 provided by  Patent Fetcher™, a product of Stroke of Color, Inc. - Page 2 of 18



*Fig.3*

*Fig.4*



*Fig.5*

This PDF of U.S. Utility Patent 5588076 provided by  Patent Fetcher™, a product of Stroke of Color, Inc. - Page 4 of 18

**U.S. Patent**        Dec. 24, 1996        Sheet 4 of 9        **5,588,076**

Fig.6



## Fig 7



## Fig.8





*Fig. 9*



*Fig. 10*



*Fig.11*

*Fig.12*

*Fig.13*

This PDF of U.S. Utility Patent 5588076 provided by  Patent Fetcher™, a product of Stroke of Color, Inc. - Page 8 of 18

*Fig.14*



*Fig.15*



This PDF of U.S. Utility Patent 5588076 provided by  Patent Fetcher™, a product of Stroke of Color, Inc. - Page 10 of 18

5,588,076

1

## OPTICAL FIBRE MANAGEMENT SYSTEM

### RELATED APPLICATIONS

This is a continuation-in-part of U.S. patent application Ser. No. 08/202,190 filed Feb. 24, 1994 entitled "OPTICAL FIBRE MANAGEMENT SYSTEM" and naming Messrs. Frost and Kerry as inventors now U.S. Pat. No. 5,548,678.

### BACKGROUND OF THE INVENTION

#### 1. Field of the Invention

This invention relates to an optical fibre management system, and in particular to an optical fibre splitter array sub-assembly for incorporation in the node of an optical fibre telecommunications network.

#### 2. Related Art

In the United Kingdom, the telecommunications network includes a trunk network which is substantially completely constituted by optical fibre, and a local access network which is substantially completely constituted by copper pairs. Flexibility in the copper access network is provided at two points en route to the customer; firstly, at streetside cabinets serving up to 600 lines; and secondly, at distribution points serving about 10–15 lines. In total, the network has about 250,000 km of underground ducts, 83,000 cabinets, 3.1 million distribution points and 3.7 million manholes and joint boxes. Eventually, it is expected that the entire network, including the access network, will be constituted by fibre.

The ultimate Goal is a fixed, resilient, transparent telecommunications infrastructure for the optical access network, with capacity for all foreseeable service requirements. One way of achieving this would be to create a fully-managed fibre network in the form of a thin, widespread overlay for the whole access topography as this would exploit the existing valuable access network infrastructure. Such a network could be equipped as needs arise, and thereby could result in capital expenditure savings, since the major part of the investment will be the provision of terminal equipment on a 'just in time' basis. It should also enable the rapid provision of extra lines to new or existing customers, and flexible provision or reconfiguration Of telephony services.

In order to be completely future proof, the network should be single mode optical fibre, with no bandwidth limiting active electronics within the infrastructure. Consequently, only passive optical networks (PONs) which can offer this total transparency and complete freedom for upgrade, should be considered.

The most common passive optical network is the simplex single star, with point-to-point fibre for each transmit and receive path, from the exchange head end (HE) to the customer network terminating equipment (NTE). This network design has been used throughout the world and meets all the access criteria. It involves high fibre count cables, and unique electro-optic provision at HE and NTE for each customer. The resulting inherent cost can only be justified for large business users, who generally also require the security of diverse routing, which increases the cost still further.

The advent of optical splitters and wavelength-flattened devices has enabled the concept of the PON to be taken one step further. These passive components allow the power transmitted from a single transmitter to be distributed amongst several customers, thereby reducing and sharing

2

the capital investment. In 1987, BT demonstrated splitter technology in a system for telephony on a passive optical network (TPON), with a 128 way split and using time division multiplex (TDM) running at 20 Mb/s. This combination enabled basic rate integrated service digital network (ISDN) to be provided to all customers. In practice, the competitive cost constraint of the existing copper network precludes domestic customers from having just telephony over fibre, due to the high capital cost of equipment. This may change in the future. In the meantime, telephony for small business users (for example those having more than 5 lines) can probably break this barrier.

The wider range of services and higher capacity required by business customers makes a 32-way split more attractive for a 20 Mb/s system and this has been demonstrated by BT's local loop optical field trial (LLOFT) at Bishop's Stortford.

In summary, the use of splitter based PON architecture will reduce the cost of fibre deployment in the access network. When compared with point-to-point fibre, savings will result from:

(i) reducing the number of fibres at the exchange and in the network;

(ii) reducing the amount of terminal equipment at the exchange;

(iii) sharing the cost of equipment amongst a number of customers;

(iv) providing a thin, widespread, low cost, fibre infra-structure; and

(v) providing a high degree of flexibility, and allowing 'just in-time' equipment and service provision.

Additionally, PON architecture can be tailored to suit the existing infrastructure resources (duct and other civil works).

Total network transparency will retain the option for future services to be provided on different wavelengths to the telecommunications, which for TPON is in the 300 nm window. By transmitting at other wavelengths, other services, such as broadband access for cable television and high definition television, or business services, such as high bit rate data, video telephony or video conferencing, can be provided. The huge bandwidth potential of fibre promises virtually unlimited capacity for the transparent network. Eventually, it will be possible to transmit hundreds of wavelengths simultaneously, as the development of technology in optical components, such as narrow band lasers, wavelength division multiplexers (WDMs), optical filters, fibre amplifiers and tunable devices, moves forward.

For this potential to remain available, and for the access network to be used to provide many and varied services, then it must be designed and engineered to provide very high levels of security and resilience. Even for simple POTS, advance warning and live maintenance are essential to limit disruption.

Resilience implies separacy of routing, and exploiting the existing infrastructure of underground ducts and other civil works is a prime requirement of the design philosophy. Analysis of this resource has indicated that separacy, from creating primary ring topographies, could be achieved by linking the spine cables which currently feed many primary connection points (PCPs) in the existing star type network.

In order to create rings from the existing star configurations, some localities will have existing ducts that will allow the link cables to be installed. In BT's suburban networks, analysis has shown that on average 60% of PCPs can be served on rings using existing ducts; and, by adding new

5,588,076

3

ducts Links of 200 m or less, a further 30% can be covered. In some cases, there will be natural or man made boundaries where physical rings cannot be provided, and in these cases duplicate fibres in the same duct route, i.e. across rivers or over railway bridges, may be the only choice.

The architecture adopted for the PON topography will be influenced by transmission techniques, and the availability of suitable splitter components. Transmission options are simplex (two fibre paths), duplex, half duplex or diplex (single fibre path).

Simplex working increases the complexity of the infrastructure due to the two fibres per circuit required. However, it benefits from the lowest optical insertion loss, due to the absence of duplexing couplers; and the lowest return loss, since such systems are insensitive to reflections of less than 25 dBm with separate transmit and receive paths. Duplex and half duplex working each have an insertion loss penalty of 7 dB from the duplexing couplers, and diplex working replaces these with WDMs, with a reduced penalty of 2 dB.

In view of the long term aim to provide a total fibre infrastructure, and the present early state of passive technology components, it is considered beneficial to opt for simplex working and a relatively low level of split ($\leq$32) for PON networks.

In an optical fibre communications system, transient changes in optical attenuation can cause transmission errors. These changes are caused by transient bend loss at various points along the fibres of the system, and the extent to which traffic along a given fibre is disturbed is dependent on such physical variables as the total loss incurred and the duration of the transient. Transient losses occur mainly because of fibre handling and maintenance procedures, particularly in the regions of fibre splices. Thus, when multi-fibre splice trays are opened, and/or fibre is handled, attenuations of up to 10 dB can be observed. For example, a typical splice tray used in optical communications systems contains 24 splices, and handling any one of the splices for maintenance purposes causes transient losses in adjacent fibres. This problem is illustrated in FIG. 15 of the accompanying drawings, which plots the probability of the occurrence of error against the system margin, at both 1550 nm and 1300 nm for a procedure which includes opening a typical 24 fibre splice tray, and running a finger along the splices. Error loss measurements are made of the fibres at splice position 14, as this splice position is almost in the centre, and so is more susceptible to transient losses than other splice positions. As shown in FIG. 15, at the optimum operating position of the receiver making the error measurement (that is to say at a system margin of 0 dB) at both 1550 nm and 1300 nm there is a large percentage error occurrence as a result of the transient losses caused by the fibre handling. As the system margin is increased, the percentage error occurrence falls at both 1550 nm and 1300 nm, but there is still a significant percentage error occurrence at 1550 nm even as the system margin approaches the dynamic range (typically 15 dB) of the receiver. The normal operating position of the receiver is the optical power nominally detected at the receiver to achieve a bit error rate (BER) of $10^{-9}$ or better. The results at 1550 nm are far worse than those at 300 nm, due to increased bend sensitivity at 1550 nm with later provision for operation at 1550 nm. This is because there may be a point at which a system may operate with no handling errors at 1300 nm, but will show a serious handling error performance at 1550 nm due to the increased bend loss sensitivity of fibres at 1550 nm. This would lead to a need

4

for an increased system margin at 1550 nm to compensate for the greater losses at 1550 nm. This is undesirable because it results in lower power budgets due to a higher required incident optical power.

## SUMMARY OF THE INVENTION

The aim of the invention is to provide a fibre management system which does not suffer from the type of transient losses referred to above. This is accomplished by what may be termed "single circuit management". In the context of an optical fibre communications system, a single circuit is one or more fibres carrying optical signals between two different Locations. Thus, a single circuit may be constituted by a single fibre which connects a transmitter/receiver pair at a first location and a transmitter/receiver pair at a second location. Similarly, a single circuit may be constituted by a first fibre connecting a transmitter at a first location to a receiver at a second location, and a second fibre connecting a transmitter at the second location to a receiver at the first location. Again, a single circuit may be constituted by a plurality of optical fibres interconnecting a transmitter at a first location and a receiver at a second location, and a plurality of fibres connecting a transmitter at the second location and a receiver at the first location. Single circuit management can also be thought of as starting at the point where a circuit breaks out from other circuits, and continues until a multiple circuit is reformed. In other words, a single circuit is one or more fibres carrying optical signals between a first separation point to either a customer terminal or a second separation point.

The optical fibre communications system of the invention provides single circuit management and so ensures that optical signals carried by any given single circuit are not degraded by installation/maintenance operations carried out on other single circuits of the system. This is accomplished by ensuring that each single circuit is housed and routed as a separate entity at a point in the network where re-entry for installation/maintenance purposes is possible. Thus, the present invention provides an optical fibre management system for managing a plurality of optical fibres, the system being such that the fibre(s) of each single circuit as hereinbefore defined is/are routed separately from the fibres of other circuits, whereby optical signals carried by any given single circuit are not degraded by handling operations carried out on the fibres of other circuits.

In a preferred embodiment, each single circuit includes at least one splice connecting first and second fibres, and wherein the splice (s) of each single circuit is/are housed in a respective splice tray. Advantageously, the or each first fibre leading to a given splice tray is housed in a respective fibre routing mechanism, and the or each second fibre leading to said splice tray is housed in a respective fibre routing mechanism. Different splice tray designs can be used. Thus, a "single circuit" splice tray is associated with a single circuit having two first fibres, two second fibres and two splices; and a "single element" splice tray is associated with a single circuit having up to eight first fibres, eight second fibres and eight splices. In the first of these cases, therefore, each splice tray houses two splices, whereby each of the fibre routing mechanisms associated with each splice tray houses a respective pair of optical fibres.

Preferably, the splice trays are arranged in a stack, each splice tray having a main body portion for holding at least one splice and for storing fibres leading to the or each splice, and a fibre entry/exit portion for feeding fibre to/from the

5

main body portion. Conveniently, each splice tray is mounted in the stack so as to be movable from a stacked position, in which it is aligned with the other trays, to first and second operating positions in which the fibre entry/exit portion and the main body portion respectively are accessible.

The invention also provides an optical fibre routing member formed with a plurality of input channels for housing respective input optical fibres, and with a plurality of output channels for housing respective output optical fibres, wherein the input channels are positioned along a first edge of the routing member, and the output channels are positioned along a second edge of the routing member, and wherein the routing member is formed with a curved guide for guiding the output fibres from the input channels to the output channels in such a manner that the fibres are not curved beyond minimum bend radius requirements for live optical fibre.

In a preferred embodiment, a common edge of the routing member constitutes the first and second edges.

Advantageously, the routing member further comprises holder means for housing splitter means which splice the input fibres to the output fibres, the curved guide means being positioned to guide the output fibres from the splitter means to the output channels.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention will now be described in greater detail, by way of example, with reference to the accompanying drawings, in which:

FIG. 1 is a perspective view, for one side, of an optical fibre telecommunications network node incorporating three splitter array sub-assemblies each of which is constructed in accordance with the invention;

FIG. 2 is a perspective view, form the opposite side, of the node of FIG. 1;

FIG. 3 is a perspective view showing the node of FIGS. 1 and 2 mounted in a footway box in a storage position;

FIG. 4 is a perspective view similar to that of FIG. 3, but showing the node 2 mounted in the footway box in its working position;

FIG. 5 is an exploded perspective view of one of the splitter array sub-assemblies of the node of FIGS. 1 and 2;

FIG. 6 is a perspective similar to that of FIG. 5, but showing parts of the sub-assembly, then parts being in their operative positions;

FIG. 7 is a perspective view of one of the splice trays of the splitter array sub-assembly of FIGS. 5 and 6;

FIG. 8 is a plan view showing the fibre entry/exit portion of the splice tray of FIG. 7.

FIG. 9 is a perspective view of one of the bendlimiting tube manifolds of the splitter array sub-assembly of FIGS. 5 and 6;

FIG. 10 is a perspective view of one of the coupler array mats of the splitter array sub-assembly of FIGS. 5 and 6;

FIG. 11 is a perspective view of the coupler array back cover of the splitter array sub-assembly;

FIG. 12 is a plan view of the break-out tray which forms part of the node of FIGS. 1 and 2;

FIG. 13 is an enlarged perspective view of part of the break-out tray;

FIG. 14 is a perspective view of another form of splice tray which can be incorporated into a splitter array sub-assembly; and

6

FIG. 15 is a graph plotting error probability against system margin for a known type of splice tray.

DETAILED DESCRIPTION OF EXEMPLARY EMBODIMENTS

Referring to the drawings, FIGS. 1 and 2 show a node N forming part of a ring topography PON. The node N includes a stack of three splitter array sub-assemblies $S_1$, $S_2$ and $S_3$ and a break-out tray T. A 96 fibre cable C, which forms a ring (loop) centred on a local exchange (not shown), enters the break-out tray T via a cable entry portion 2 (see FIG. 12) after passing through a node base 1. The cable (then passes at least twice round a generally oval perimeter track 3 of the tray T, and leaves the tray via the portion 2. The 96 fibres are housed in twelve flexible tubes (not shown) made of plastics material, each of the tubes containing eight primary-coated fibres. As is described in detail below with reference to FIG. 12, the tray T includes a break-out region B in which individual fibre end portions, formed by cutting into one of the tubes, are led to the splitter array sub-assemblies $S_1$, $S_2$ and $S_3$. In this connection, it should be noted that the tray T stores a sufficient length of the cable C so that, after cutting one of the tubes in the middle of this stored length, and stripping back that tube to expose its optical fibres, each of the originally continuous fibres forms two fibre end portions whose length is sufficient to be led to the splitter array sub-assemblies $S_1$, $S_2$ and $S_3$, and to leave spare fibre which can be stored for future use.

FIGS. 3 and 4 show the mounting of the node N in a footway box F, a dome-shaped cover D being fixed to the node base 1 prior to mounting.

One of the splitter array sub-assemblies, $S_1$, is shown in detail in FIGS. 5 and 6. The other two sub-assemblies $S_2$ and $S_3$ are the same as the sub-assembly $S_1$. The sub-assembly $S_1$ includes a stack of ten splice trays 4, each of which is 8 ram thick. The trays 4 are supported (in a manner described below) by a stainless steel chassis 5 constituted by a top plate $5a$, a base plate $5b$ and a back plate $5c$. Each of the splice trays 4 is a single circuit splice tray, that is to say, in use, it has two incoming optical fibres (one each for transmitting and receiving), and two outgoing optical fibres (one each for transmitting and receiving). The three plates $5a$, $5b$ and $5c$ are welded together, and the top plate $5a$ of the sub-assembly $S_1$ can be fixed to the base plate $5b$ of the adjacent sub-assembly $S_2$ (not shown in FIGS. 5 and 6) by means of mounting bolts (not shown). Similar mounting bolts can be used to fix the plate $5a$ of the sub-assembly $S_1$ and the plate $5b$ of the sub-assembly $S_3$ to support means (not shown) in the node N.

The chassis 5 also supports an input splitter array mat 6, an output splitter array mat 7, and a splitter array back cover 8. In this connection, the input mat 6 carries (as is described below with reference to FIG. 10) fibres which carry telecommunications signals from the exchange to customers. These fibres are termed transmit fibres. Similarly, the output mat 7 carries fibres which carry telecommunications signals from customers to the exchange. These fibres are termed receive fibres. The mats 6 and 7 are made of a flexible polymer, for example an elastomeric polymer such as injection mouldable zantoprene, or polyurethane. The back cover 8 is made of flexible polypropylene (which is also injection mouldable). This inherent flexibility ensures that, in use, the mats 6 and 7 are held firmly against the chassis back plate $5c$ by the back cover 8.

As shown in FIG. 7, each splice tray 4 has a main body portion 9 and a fibre entry portion 10 which also constitutes

This PDF of U.S. Utility Patent 5588076 provided by Patent Fetcher™, a product of Stroke of Color, Inc. - Page 13 of 18

5,588,076

7                                                          8

a clip-on test area. Fibre access to the main body portion **9** from the fibre entry portion **10** is via a channel **11**. The main body portion **9** is of oval configuration, having an oval base **9a** and an upstanding peripheral wall **9b**. A hollow mandrel **12** is provided on the base **9a** adjacent to the entry channel **11**. The mandrel **12** is of rounded square cross-section, is sized to ensure minimum bend requirements for live fibre passing around it, and has a fibre inlet aperture **12a** through which dark fibre can pass for internal storage. A channel **13** is defined between the mandrel **12** and the peripheral wall **9b**, the channel **13** leading to a further channel **14** which leads around the inside of the wall to a splice holder region **15** in use, this region **15** houses a splice holder (not shown) for splicing two incoming fibres to two outgoing fibres. A direction reversing channel **16** leads from the channel **14** adjacent to the region **15** back to that portion of the channel **14** which adjoins the channel **13** adjacent to the mandrel **12**.

The fibre entry portion **10** of each splice tray **4** includes three fibre entry/exit ports **17a**, **17b** and **17c** (see FIG. **8**). Diverging channels **18a** and **18b** are provided to lead fibre between the port **17a** and the channel **11** via respective apertures **19a** and **19b**. These apertures **19a** and **19b** constitute what are known as "clip-on apertures", and provide easy access to the associated fibres in order to measure the light passing there along, and hence to determine the quality of the splices. These clip-on apertures, and associated light measurement apparatus, are described in the specification of our International patent application WO 93/00600.

Similar diverging channels **20a** and **20b** are provided to lead fibre between the port **17c** and the channel **11** via respective clip-on apertures **21a** and **21b**. A single channel **22** is provided for leading fibre between the port **17b** and the channel **11**. The channel **22** is not provided with a clip-on aperture.

Each splice tray **4** is also provided with a number of fibre retention tabs **23** for holding fibre in the various channels **11**, **13**, **14**, **16**, **18a**, **18b**, **20a**, **20b** and **22**. One of these tabs (indicated by the reference numeral **23a**) is generally V-shaped, and extends from the curved end of the peripheral wall **9b** remote from the mandrel **12** about halfway across, and above, that portion of the base **9a** between that wall portion and the mandrel.

Each tray **4** is pivotally mounted on the splitter array back cover **8** by means of a leash **24** and a retaining ring **25** which are moulded integrally with the rest of the tray. The leash **24** of each tray **4** has two arms **24a** and **24b** joined together by a hinge **24c**. Its retaining ring **25** is a friction fit within a groove **26** formed in the back cover **8** (see FIG. **11**). In use, a rod (not shown) passes through all the retaining rings **25** and through apertures (not shown) in the top and base plates **5a** and **5b**. In this way all the splice trays **4** are retained by their back plates **5c**, but each can be pivoted out away from the other trays in the stack to provide access to its clip-on apertures **19a**, **19b**, **21a** and **21b**. In this position, the arms **24a** and **24b** take up a generally straightline configuration (as opposed to the V-shaped configuration they have when the tray is in the stack). As the retaining ring **25** of a pivoted-out tray **4** is held in position by the retaining rod, the pivotal movement of the tray is limited by the leash **24** as its two arms **24a** and **24b** straighten out. In the fully pivoted-out position, the fibre entry portion **10** of a Tray **4** is exposed.

Each of the splitter array sub-assemblies S₁, S₂ and S₃ is associated with two fibres (four fibre end portions) of the eight fibres in the cut tube of the cable. The remaining two fibres (four fibre end portions) from the cut tube are stored in the break-out tray T as described below with reference

to FIG. **13**. As the cable C is in the form of a ring, telecommunications signals can travel to/from the exchange in either direction round the ring. For convenience, one of the directions is termed the main direction, and the other the standby direction. In practice, only main fibres will be used for normal signalling, the standby fibres only being used in the eventuality of main fibre failure.

The two main fibre end portions associated with say the splitter array sub-assembly S₁ pass from the break-out tray T to the lowest splice tray **4** of that assembly, the fibre end portions being supported in, and protected by, a bend limiting tube **27a** (see FIG. **6**). This bend limiting Tube **27a** is a proprietary item made of polypropylene ringed tubing which, though flexible, cannot easily be bent beyond minimum bend radius requirements for live fibre. The bend limiting tube **27a** terminates in the port **17a** of the lowest splice tray **4**, and its two fibre end portions are led into the main body portion **9** via the channels **18a** and **18b**, the clip-on apertures **19a** and **19b**, and the channel **11**. These fibre end portions are then spliced to the ends of a pair of fibres which (as is described below) are associated with the mats **6** and **7**. These two splices are then positioned in a splice holder which is then mounted in the region **15**. The four fibres leading to the splices are then stored in the main body portion **9** of the tray **4** with two of the fibres (for example those from the break-out tray T) being led away from the splices in the channel **14**, and the other two fibres being led away from the splices via the channel **13** and the reversing channel **16**. A length of each of the fibres is stored in the main body portion **9** of the tray **4** by passing these fibres one or more times round the mandrel **12** and under the V-shaped tab **23a**. The fibres' natural resilience will ensure that the loops of fibre expand outwardly into a configuration of varying diameter turns. The provision of stored fibre permits a minimum of ten re-splices of each of the splices to be carried out during the lifetime of the assembly.

The two fibres which are associated with the mats **6** and **7** leave the main body portion of the tray **4** via the channel **11**. They are then led to the port **17c** of the entry portion **10** via the clip-on windows **21a** and **21b** and the channels **20a** and **20b**. These fibres are then led to the mats **6** and **7** within a bend limiting tube **27c** (see FIG. **6**). One of these main input fibres terminates on the input mat **6**, where (as is described below with reference to FIG. **10**) it is joined by splitter means to eight output fibres. Similarly, the other of these main input fibres terminates on the output mat **7**, where it is joined by splitter means to eight output fibres.

The two main fibre end portions and the associated pair of fibres to which they are spliced constitute a single circuit, this circuit starting in the break-out region B of the break-out tray T and finishing at the input to the splitter mats **6** and **7**. Throughout the length of this single circuit, its fibres are routed separately from the fibres of other circuits, so that single circuit management results. Thus, in the break-out region B of the break-out tray T the two main fibre end portions are separated (as described in greater detail below with respect to FIG. **13**) from the other cut fibre end portions. These two fibre end portions are then fed to the splitter array sub-assembly S₁ within the bend limiting tube **27a**, after which they are fed into the lowest splice tray **4** of that assembly. The two fibres spliced to these main fibre end portions are then fed to the splitter mats **6** and **7** within the bend limiting tube **27c**. Clearly, the fibres carried by this splice tray **4** form part of the single circuit. Consequently, the entire single circuit between the break-out point and the splitting point is separated from all other circuits in the region where reentry for installation/maintenance purposes

This PDF of U.S. Utility Patent 5588076 provided by Patent Fetcher™, a product of Stroke of Color, Inc. - Page 14 of 18

5,588,076

**9**

is to be expected. This ensures that optical signals carried by this circuit are not degraded by installation/maintenance operations carried out on other circuits of the system.

The two standby fibre end portions associated with this splitter array sub-assembly $S_1$ pass from the break out tray T to the second lowest splice tray 4 of that assembly. Here, these two fibre end portions are spliced to two fibres which are led back to the mats 6 and 7 and so are termed standby input fibres, and each of the standby input fibres is joined by splitter means to the same eight output fibres as the corresponding main input fibre. The fibre arrangement on this second lowest splice tray 4 is the same as that for the lowest splice tray. Similarly, fibres enter and leave this splice tray 4 in bend limiting tubes $27a$ and $27c$.

Thus, the two standby fibre end portions and the associated pair of fibres to which they are spliced also constitute a single circuit, this circuit starting in the break-out region B of the break-out tray T and finishing at the input splitter mats 6 and 7. As with the single circuit associated with the main fibre end portions, this single circuit has its fibres routed separately from other circuits throughout its length, so that single circuit management results.

The remaining eight splice trays 4 in the sub-assembly $S_1$ of FIGS. 5 and 6 are customer splice trays. As the fibre arrangement in each of these customer splice trays 4 is the same, this will be described in detail for only one of these trays. Thus, one of the output fibres from each of the mats 6 and 7 (that is to say a transmit fibre and a receive fibre) is led to the port $17c$ of a given customer splice tray 4 inside a bend limiting tube $27c$. These two fibres are led into the main body portion 9 of the tray 4 via the channels $20a$ and $20b$, the clip-on windows $21a$ and $21b$, and the channel 11. In use, these fibres are spliced to two fibres of a four-fibre blown fibre unit associated with a given customer. Such a unit has four fibres in a single tube, the tube being fed between the customer and the node N by the well known fibre blowing technique (see EP 108590). The customer's blown fibre unit is led to the port $17a$ of the splice tray 4 within a bend limiting tube $27a$. The blown fibre coatings are stripped away from the four fibres "downstream" of the port $17a$.

Two of the fibres within the unit (the two fibres which are to be spliced to the transmit and receive fibres from the mats 6 and 7, and so are termed live fibres) are fed to the main body portion 9 of the splice tray 4 via the channels $18a$ and $18b$, the clip-on apertures $19a$ and $19b$, and the channel 11. The two other fibres (which are spare fibres not for immediate use) are fed to the main body portion 9 of the splice tray 4 via the channels 22 and 11. All four fibres then pass round the mandrel 12 within the channel 13, and then back to the mandrel after passing along the channels 14 and 16. The two spare (dark) customer fibres pass through the aperture $12a$ and are stored inside the mandrel 12. The two live fibres pass round the mandrel 12, and are then spliced to the transmit and receive fibres from the mats 6 and 7, the splices are stored in a splice holder, and the splice holder is positioned in the region 15. As with the two lowest splice trays 4, each of the spliced fibres has a length to be stored (enabling up to ten re-splices to be made during the lifetime of the assembly), these fibre lengths likewise being stored by looping them each one or more times round the mandrel 12 and under the V-shaped tab $23a$.

The two fibres leading to each of the customer splice trays 4 and the two fibres spliced thereto from the associated four-fibre blown fibre unit constitute a single circuit, this circuit starting at the output of the splitter mats 6 and 7, and

**10**

terminating at the transmitter/receiver pair of the customer. Throughout the length of this single circuit, its fibres are routed separately from the fibres of other circuits, so that single circuit management results. Thus, from the exit of the splitter mats 6 and 7, the output fibres from the splitter mats are fed to the splitter array sub-assembly $S_1$ within the associated bend limiting tube $27c$. Within the associated splice tray 4, these fibres are spliced to two fibres of the customer's four-fibre blown fibre unit. This tray 4 thus houses only fibres forming part of a single circuit, and the tube of the blown fibre unit separates the fibres of that circuit from fibres of other circuits of the system all the way to the customer's premises. Consequently, the entire single circuit between the output of the splitter mats 6 and 7 and the transmitter/receiver pair of the customer is separated from all other circuits. In particular, in the region where re-entry for installation/maintenance purposes is to be expected (that is to say in the region of the node N), single circuit management is ensured, so that optical signals carried by any given single circuit are not degraded by installation/maintenance operations carried out on other circuits.

In order to access the splices within a given splice tray 4, it is necessary to remove the rod holding the retaining rings 25 in position, prior to the pulling out that tray out of the stack sufficiently far to gain access to the splices. In this position, the tray 4 is maintained in position by its bend limiting tubes.

The two spare customer fibres stored within the mandrel 12 of a given splice tray 4 can be used to replace the two live fibres of that customer in the event of these fibres failing. More importantly, however, they can be used to provide that customer with additional lines or service. (In this connection, it should be noted that each fibre pair can provide up to 32 lines using customer premises equipment (CPE) electronics such as an optical network unit (ONU) matched to an optical line terminal (OLT) at the exchange. Each pair of fibres can also provide a Megastream service.) In this case, the two spare fibres are removed from their storage position within the mandrel 12, and are led to the fibre entry portion 10 of the tray 4 via the channels 13 and 11. They then leave the tray 4, via the apertureless channel 22 and the port $17b$, and enter a bend limiting tube $27b$ (see FIG. 6). This tube $27b$ is routed via the back cover plate 8 to another splice tray 4—usually a splice tray of another of the sub-assemblies $S_2$ or $S_3$ of the node N. The tube $27b$ terminates at the port $17a$ of this tray 4, and the two fibres are led into the main body portion 9 via the channels $18a$ and $18b$, the apertures $19a$ and $19b$, and the channel 11. Here they are spliced to two "exchange" fibres, and all spare lengths of fibre are stored in the same manner as that described above for the other splice trays. In this connection, the "exchange" fibres could be either a second pair of fibres from the break-out tray T (direct exchange fibres), or a pair of output fibres from the mats 6 and 7 (indirect exchange fibres).

These two spare fibres and the associated "exchange" fibres thus constitute a single circuit, this circuit starting at the splice tray 4 which originally stored the two spare fibres, and terminating either at the break-out tray T or at the mats 6 and 7. In this case, the single circuit does not extend to the transmitter/receiver pair of the customer, as the two pairs of the four-fibre unit are housed in the same tube. The single circuit thus terminates at the point in the splice Tray 4 where the two pairs of fibres are separated, that is to say where a multiple circuit becomes two single circuits. Throughout the length of this single circuit, its fibres are routed separately from the fibres of other circuits, so single circuit management results. Thus, from the point in the first tray 4 where the two pairs of fibres from the customer are separated, the

5,588,076

11

"spare" fibres are routed separately from the two "live" fibres within the tray. On leaving that tray 4, the "spare" fibres pass to another splice tray 4 within an associated bend limiting tube 7b. These fibres are spliced to "exchange" fibres in this second tray 4, and the two "exchange" fibres are passed either to the break-out tray T within a bend limiting tube 7a, or to the mats 6 and 7 within a bend limiting tube 27c. In particular, in the region where re-entry for installation/maintenance purposes to be expected (that is to say in the region of the node N), single circuit management is ensured, so that optical signals carried by the single circuit are not graded by installation/maintenance operations carried out on other circuits.

As each of the splice trays 4 is associated with a respective single circuit, these splice trays are termed single circuit splice trays.

The bend limiting tubes 27a, 27b and 27c of each of the splice trays 4 are provided with respective support manifolds M (see FIGS. 6 and 9). Each manifold M is a sliding friction fit on a flanged portion (not shown) of the chassis back plate 5c, and is provided with an open aperture 28a for supporting the associated bend limiting tube 27a, and with a pair of closed apertures 28b and 28c for supporting respectively the associated bend limiting tube 27b (if there is one) and the associated bend limiting tube 27c. The manifolds M are made of injection moulded filled nylon.

FIG. 10 shows the input mat 6 of the sub-assembly $S_1$. The output mat 7 of this sub-assembly, being of identical construction to the input mat 6, will not be described in detail. The mat includes an input slot 29 for receiving the main input fibre, and an input slot 30 for receiving the standby input fibre. These two slots 29 and 30 lead to an aperture 31 which houses a 2×2 fused coupler (not shown). The two output fibres from this fused coupler are led via a curved channel 32 around a mandrel 33. The mandrel 33 has a radius of 30 mm, and so fulfils the minimum bend requirements for live fibre. Each of the fused coupler output fibres is spliced to an input fibre to a respective 1×4 planar coupler (splitter). The two splices are stored in a recess 35b.

The two planar couplers (not shown) are housed in an aperture 34 adjacent the aperture 31. The two fibres pass from the mandrel 33 to Their planar couplers via the curved end wall 35a of a recessed portion 35 of the mat 6, and via respective curved slot 36. The eight output fibres of the two planar couplers pass round the mandrel 33 via a slot 37. These fibres then leave the mat 6 via respective output slots 38 which fan out over the recessed portion 35 and the adjacent raised portion which defines the curved end wall 35a.

The mat 6 thus forms a 2×8 splitter for the transmit fibres, with one of its inputs being the main transmit input fibre and the other the standby transmit input fibre. As mentioned above, only main fibres are used in normal operation, so the mat 6 acts as a 1×8 splitter. However, should there be problems with the main fibre route, the mat 6 will still act as a 1×8 splitter with the standby receive fibre as its input fibre.

Similarly, the mat 7 constitutes a 2×8 splitter for the receive fibres.

FIG. 11 shows the splitter array back cover 8 of the sub-assembly $S_1$ in greater detail. The back cover 8 is formed with a pair of longitudinally-extending grooves 8a adjacent to that end remote from the groove 26. These grooves 8a reduce the thickness of the back cover in this end region, and so enhance the flexibility of the back cover, thereby ensuring that, in use, the back cover holds the mats 6 and 7 firmly against the chassis back plate 5c. In this

12

connection, it should be noted that this end region of the back cover 8 is formed with an in-turned L-shaped flange 8b which can be snapped over grooves 28d formed in the manifolds M to hold the back cover to the chassis 5 with the mats 6 and 7 firmly sandwiched therebetween.

The outer surface of the back cover 8 is also provided with a plurality of longitudinally-extending ribs 8c, the base of each rib being formed with a plurality of apertures 8d. These apertures 8d extend right through the back cover 8 to its inside surface, and constitute a matrix of tie points for the attachment of cable ties which are used to tie the bend limiting tubes 27a, 27b and 27c to the sub-assembly S.

FIG. 12 snows the break-out tray T in greater detail. As mentioned above, two loops of the cable are stored in the track 3, before the cable exits the break-out track T via the entry portion 2, and one of the tubes of the cable is cut in the middle of its stored length. One of the cut fibres forms the main fibre for the splitter array sub-assembly shown in FIGS. 5 and 6, and another the standby fibre for that sub-assembly. The remaining fibres can be main and standby fibres for other splitter array sub-assemblies $S_2$ and $S_3$ of the node N, or can be stored around a mandrel 39 at that end of the tray T remote from the cable entry portion 2. The mandrel 39 has a rounded rectangular cross-section, and is sized so that fibre coiled thereabout does not exceed minimum bend radius requirements.

The break-out region B of the tray T is formed with a plurality of curved upstanding fingers 40, adjacent pairs of which define sixteen fibre feed channels 41. The two fibre end portions that constitute the main fibres associated with the lowest splice tray 4 of the sub-assembly $S_1$, are fed through the first channel 41 (that is to say through the channel nearest the entry portion 2). Similarly, the two fibre end portions that constitute the standby fibres associated with the second lowest splice tray 4 are fed through the second channel 41. (As there are sixteen channels 41, the break-out tray T can handle sixteen pairs of fibre end portions, that is to say all the fibre end portions from two cut tubes.) The two fibres then pass into the bend limiting tube 27a associated with the lowest splice tray 4 of the sub-assembly $S_1$. This tube 27a passes through an aperture 42 in a raised portion 43 of the break-out region B (see FIG. 13), and is tied in place by ties (not shown) associated with a further aperture 44.

A preferred form of TPON includes a 32-way split, that is to say each fibre from the exchange serves 32 actual customers via one or more splitting (flexibility) points such as the node N described above. As the node N defines an 8-way split, it could be used as a primary splitting point, in which case each of the "customer" fibres leaving the node would lead to a respective secondary splitting point. In this case, each of the single circuits associated with a customer tray 4 would start at the output of the splitter mats 6 and 7, and terminate at the input to the secondary splitting point. Alternatively, if the "customer" fibres leading to the secondary splitting point are fed back into a multi-fibre tube, the single circuit terminates at the entry to this tube. In either case, in the region where re-entry for installation/maintenance purpose is to be expected, single circuit management is ensured.

Each of the secondary splitting points would be similar to the node N, but each incoming fibre would be split four ways rather than eight ways. As the outgoing fibres from a primary node do not go directly to customers, the terms "customer splice trays" and "customer fibres" used above should be taken to mean splice trays and fibres associated with either

5,588,076

13

actual customers or with downstream splitting points. Of course, in the preferred 32-way split form of TPON, the nodes N could also be secondary nodes. In this case, there would be four nodes N, each serving eight actual customers, and the four secondary nodes would be served via a 4-way split primary node. Here again, the primary node, would be similar to the node N, but each incoming (exchange) fibre would be split four ways rather than eight ways.

It will be apparent that the type of splitter array sub-assembly described above is extremely flexible in that it can readily be adapted to suit different requirements. In particular, it is adaptable to any splitting ratio by varying the number of splice trays used and the size and form of the splitter array mats 6 and 7. Moreover, by co-locating several splitter array sub-assemblies in a node, splitting from a plurality of exchange fibres can be accomplished at any given point, using different splitting ratios in each sub-assembly if required.

It will be apparent that the arrangement described above ensures single circuit management. In particular, in the region of a node N (that is to say where re-entry for installation/maintenance purposes is to be expected) single circuit management is ensured, so that optical signals carried by any single circuit are not degraded by installation/ maintenance operations carried out on any other circuit.

An important advantage of the sub-assemblies described above, is that the splitters and the associated fibres can all be factory fitted. Thus, the fused and planar couplers and their associated fibres can be made and positioned in the mats 6 and 7, and the associated fibres can be led to their splice trays 4 within bend limiting tubes—all at the factory. When the sub-assembly is to be commissioned, the fitter needs only to cut one or more tubes of the cable C, feed main and standby fibre end portions to the lowest two splice trays 4 of the sub-assembly, store spare cut fibre end portions in the break-out tray T, splice the main and standby fibre end portions to the main and standby input fibres already present in the two splice trays, and to splice "customer" fibres to the fibres already present in the other splice trays 4. In this way, the amount of skilled work which has to be carried out on site is reduced to a minimum. In particular, the fitter does not need to carry out any intricate splicing for splitting purposes.

The sub-assembly described above could also be adapted for use in a spur joint. In such a case, no splitting is required, so the sub-assembly would not include the mats 6 and 7. In a first type of spur joint, all twelve tubes of the fibre cable C would be cut, thereby forming twelve main fibre tube ends and twelve standby fibre tube ends. The fibres of six of the main fibre tube ends would then be spliced to the fibres of six of the standby fibre tube ends in single element splice trays 45 (as is described below with reference to FIG. 141. The fibres of the remaining six main fibre-tube ends are then spliced to "customer" fibres in 24 single circuit splice trays 4. Similarly, the fibres of the remaining six standby fibre tube ends are spliced to 48 "customer" fibres in 24 single circuit splice trays 4. Thus, two fibres are fed, in bend limiting tubes, from a breakout tray (not shown) to each of the 48 single circuit splice trays 4, where they are spliced to "customer" fibres in a similar manner to that described above with reference to FIGS. 5 and 6. As with the customer splice trays 4 discussed above, single circuit management results for each of these 48 splice trays.

A respective main fibre tube end and a respective standby fibre tube end are fed from the break-out tray to each of the single element splice trays 45 (see FIG. 14), each tube end being in a respective bend limiting tube (not shown, but

14

similar to the bend limiting tubes 27a, 27b and 27c). Each tray 45 has a main body portion 46 and a tube entry portion 47. The main body portion 46 is of oval configuration, having an oval base 46a and an upstanding peripheral wall 46b. Fibre access to the main body portion 46 from the tube entry portion 47 is via a channel 48. Channels 49, 50, 51 and 52 are provided in the main body portion 46 to guide main and standby fibres to a pair of splice holder regions 53. The channel 51 is a direction reversing channel, and permits main and standby fibres to approach each of the splice holder regions 53 from opposite directions.

Each single element splice tray 45 is also provided with a number of fibre retention tabs 54 for holding fibre in the various channels 49 to 52.

The tube entry portion 47 of each single element splice tray 45 includes two tube entry/exit ports 55a and 55b. Channels 56a and 56b are provided to lead fibre between the ports 55a and 55b and the channel 48.

The single element splice tray 45 is provided with a leash 57 and a retaining ring 58 (similar to the leash 24 and the retaining ring 25 of the tray 4). The leash 57 permits the tray 45 to be pivoted out of a stack of trays to enable access to the tube entry portion 47.

In use, a main fibre tube end is led to the port 55a of each of the splice trays 45, and a standby fibre tube end is led to the port 55b of each of the splice trays 45. Inside each tube entry portion 47, the tubes are cut away to expose the fibres. The fibres are then fed into the main body portion 46 of the trays, where they are spliced. The eight splices in each tray 45 are then positioned, four in each of a pair of splice holders, and the splice holders are then mounted in the regions 53. The fibres leading to the splices are then stored in the main body portions 46 of the trays 45. A length of each of the fibres is stored in the main body portion 46 of the associated tray 45 by passing these fibres one or more times round an upstanding mandrel 59 and under the tabs 54. The fibres' natural resilience will ensure that the loops of fibre expand outwardly to a configuration of varying diameter turns. The provision of stored fibre permits re-splicing to be carried out during the lifetime of the assembly.

In a modified version of the spur joint described above, only six of the tubes are cut, the fibres in these tubes being spliced to "customer" fibres in 48 single circuit splice Trays 4 as described above. The remaining six uncut tubes are looped around a break-out tray. Alternatively, instead of using 48 single circuit splice trays 4, six single element splice trays 45 could be used. This alternative would, however, only be used in cases where there is no need to access spur joints for future use.

Obviously, for either type of spur joint, the number of fibres forming the spur can be varied. For example, the spur could be formed from the fibres of one cut tube. In this case the spur would contain 16 fibres (eight main fibres and eight standby fibres from a single cut tube) and 88 fibres (from the remaining eleven tubes—either cut and spliced or uncut and coiled) would continue through on the ring. In each case, however, single circuit management is ensured for each of the single element splice trays 45. Thus, the single circuit associated with a given single element splice tray 45 starts and terminates at the break-out tray T, a respective main fibre tube end being fed to the splice tray 45 in a bend limiting tube, where its fibres are spliced to the fibres of the standby fibre tube and which, in turn, is fed back to the break-out tray within a bend limiting tube. The single circuit here is, therefore, constituted by a plurality of fibres (eight in the example above).

This PDF of U.S. Utility Patent 5588076 provided by  Patent Fetcher™, a product of Stroke of Color, Inc. - Page 17 of 18

5,588,076

15

We claim:

1. An optical fibre management system for managing a plurality of optical fibres in an optical fibre communication system having at least one fibre separation point between a terminal site and an optical signal processing node such that the fibre of each single optical fibre circuit is routed separately from the fibre of other circuits, said system comprising:

a plurality of individually accessible fibre service trays with access ports for optical fibres, and

each said service tray having therein only optical fibre for a single circuit carrying optical signals between a first separation point and either a terminal or a second separation point,

whereby optical signals carried by any given single circuit are not degraded by handling operations carried out on the fibres of other circuits.

2. A system as in claim 1 wherein each single circuit includes at least one splice connecting first and second fibres, and wherein the at least one splice of each single circuit is housed in a respective splice tray.

3. A system as in claim 2 wherein each first fibre leading to a given splice tray is housed in a respective fibre routing mechanism, and each second fibre leading to said given splice tray is housed in a respective fibre routing mechanism.

4. A system as in claim 3 wherein each splice tray houses two splices, whereby each of the fibre routing mechanisms associated with each splice tray houses a respective pair of optical fibres.

5. A system as in claim 2 wherein plural splice trays are arranged in a stack, each splice tray having a main body portion for holding at least one splice and for storing fibres leading to each such splice, and a fibre entry/exit portion for feeding fibre to/from the main body portion.

6. A system as in claim 5 wherein each splice tray is mounted in a stack so as to be movable from a stacked position, in which it is aligned with the other trays, to first

16

and second operating positions in which the fibre entry/exit portion and the main body portion respectively are accessible.

7. A method for managing a plurality of optical fibres in an optical fibre communication system having at least one fibre separation point between a customer terminal site and an optical signal processing node to define a plurality of optical fibre circuits, each circuit including optical fibre carrying optical signals from a first separation point to either a customer terminal or a second separation point, said method comprising:

separately routing the optical fibre of each single circuit through its own dedicated fibre access service tray which does not contain fibre from any other circuit;

servicing optical fibre in a given single circuit without substantial disturbance to optical fibre in any other circuit by individually accessing the service tray dedicated to such given single circuit.

8. Apparatus for managing a plurality of optical fibres in an optical fibre communication system having at least one fibre separation point between a customer terminal site and an optical signal processing node to define a plurality of optical fibre circuits, each circuit including optical fibre carrying optical signals from a first separation point to either a customer terminal or a second separation point, said apparatus comprising:

means for separately routing the optical fibre of each single circuit through its own dedicated fibre access service tray which does not contain fibre from any other circuit; and

means for servicing optical fibre in a given single circuit without substantial disturbance to optical fibre in any other circuit by individually accessing the service tray dedicated to such given single circuit.

*   *   *   *   *